*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* HENRY, Minors.

UNPUBLISHED
February 24, 2026
10:27 AM

No. 375032
Kent Circuit Court
Family Division
LC Nos. 23-050138-NA; 23-
050139-NA

Before: RICK, P.J., and MALDONADO and KOROBKIN, JJ.

PER CURIAM.

Respondent-mother appeals as of right the trial court's order terminating her parental rights to the minor children, WH and MH, under MCL 712A.19b(3)(c)(*i*) (conditions leading to adjudication continue to exist), MCL 712A.19b(3)(g) (failure to provide proper care and custody), and MCL 712A.19b(3)(i) (prior termination of parental rights because of serious and chronic neglect).[1] We affirm in part, vacate in part, and remand.

## I. FACTUAL BACKGROUND

In January 2023, WH and MH were taken into protective custody because of housing instability and domestic violence, leading petitioner, the Department of Health and Human Services (DHHS) to file an initial petition to terminate mother's and respondent-father's[2] parental rights under MCL 712A.19b(3)(i). Mother admitted to the previous involuntary termination of her

---

[1] The order also terminated the parental rights of the children's legal father, who is not a party to this appeal.

[2] Respondent-father was named in the petition and ultimately had his parental rights to MH and WH terminated. He has taken no action to challenge the termination of his parental rights and does not participate in this appeal. Accordingly, all references to father are for background information only.

parental rights to three older children in 2014 because of similar issues. The trial court declined to terminate parental rights and instead ordered that efforts be made to reunify the family.

Initially, mother made significant progress, participating in domestic violence counseling, parenting time, and other services. She was successful in obtaining unsupervised overnight parenting time visits with the children. By April 2, 2024, the case reached its high point for mother, with the children's caseworker reporting that mother had completed all required tasks and was ready for the children to be returned. However, on May 6, 2024, CPS received a report that father had broken into mother's house during her unsupervised weekend parenting time. When mother failed to obtain a personal protection order (PPO) as requested by DHHS, concerns arose about her ability to protect the children from domestic violence. Subsequently, WH reported believing that father might be living in mother's basement. The children reported seeing signs that father was living in the basement, which mother denied. Nevertheless, the trial court found the children's reports credible and directed the agency to address specific issues with mother to ensure safe reunification.

By November 2024, the children's well-being had declined. WH exhibited escalating unsafe behaviors, required police involvement, and was hospitalized multiple times. He expressed anger toward mother and fear about returning to her home. MH also struggled with sleeping, argumentative behavior, and experienced depression and anxiety when visiting mother. Mother's housing was also at risk because of rent arrears. Her parenting skills were additionally identified as a barrier to reunification.

In December 2024, petitioner filed a supplemental petition for the termination of mother's parental rights under MCL 712A.19b(3)(c)(*i*) and (g). Attached to the supplemental petition was a document describing the case's history, the initial challenges, the progress made, and remaining barriers to reunification with respect to housing, child characteristics, emotional instability, parenting skills, and domestic relations. The termination hearing was held in March 2025. At the hearing, the trial court found clear and convincing evidence to support the termination of mother's parental rights under MCL 712A.19b(3)(c)(*i*), (g), and (i). The court further found that termination of mother's parental rights was in the children's best interests. The court thereafter entered an order terminating mother's parental rights. This appeal followed.

II. ANALYSIS

A. STATUTORY GROUNDS

Mother first argues that the trial court clearly erred by finding that clear and convincing evidence established statutory grounds for termination of her parental rights under MCL 712A.19b(3)(c)(*i*), (g), and (i). We disagree.

Appellate courts review for clear error a trial court's decision that a ground for termination has been proven by clear and convincing evidence, and that termination is in the children's best interests. *In re Trejo Minors*, 462 Mich 341, 356-359; 612 NW2d 407 (2000). A finding is clearly erroneous if, although there is evidence to support it, this Court is left with a "definite and firm conviction" that a mistake was made. *In re Mason*, 486 Mich 142, 152; 782 NW2d 747 (2010) (quotation marks and citation omitted). "If the trial court did not clearly err by finding one

-2-

statutory ground existed, then that one ground is sufficient to affirm the termination of the respondent's parental rights." *In re Sanborn*, 337 Mich App 252, 273; 976 NW2d 44 (2021).

MCL 712A.19b(3)(c)(*i*) supports termination when "182 or more days have elapsed since the issuance of an initial dispositional order," and the trial court finds by clear and convincing evidence that "[t]he conditions that led to the adjudication continue to exist and there is no reasonable likelihood that the conditions will be rectified within a reasonable time considering the child's age."

Here more than 182 days elapsed since the issuance of the initial dispositional order. The conditions that led to mother's adjudication were: (1) housing instability; (2) inadequate finances; (3) domestic violence; (4) emotional instability; and (5) parenting skills. The trial court did not find that mother lacked adequate housing or resources, but nevertheless determined that mother had not adequately rectified her issues with emotional instability and inadequate parenting skills.

Initially, DHHS provided positive assessments of mother's parenting skills and emotional stability, praising her performance at parenting time and her ability to manage the children's conduct effectively. Mother had a legal source of income and suitable housing; exercised unsupervised overnight parenting time with the children; and was a mere two to three weeks away from reunification. However, the break-in incident in May 2024, the children's subsequent disclosures regarding mother allowing father to live in the home, and mother's poor response to those disclosures led DHHS to reassess mother's parenting skills, emotional stability, and benefit from her treatment plan.

The evidence presented to the trial court indicated that parenting time went well only when neither child had a meltdown. However, when the children became "escalated," mother responded similarly. Mother would then blame her caseworkers or the foster-care system for the children's behavior. This dynamic raised questions about mother's emotional stability and ability to handle the children in an emotional crisis. In addition, a Bethany Christian Services (BCS) supervisor and the trial court stressed more than once mother's inability to understand—or to even acknowledge—the connection between her children's behaviors and their exposure to domestic violence in her household, as well as the effect that this lack of insight had on mother's parenting skills.

Mother responded poorly to the children's disclosure that they believed father was living in the basement of the family home. Regardless of whether he was actually living in the basement, mother failed to adequately consider the children's emotional states and clearly alienated WH, causing him to grow angry with her and to view her as a liar. WH's mental health additionally deteriorated over the course of the proceedings. At one point he was admitted to the hospital for emergency psychiatric care, and mother failed to respond to the hospital's multiple attempts to contact her regarding the hospitalization. Her response to the hospitalization raised questions about the extent to which she could recognize and operate effectively in a crisis situation to ensure her children's health and safety. Additionally, mother's counselor testified that, although she had made improvements in emotional regulation and stability, it was difficult to determine whether she could protect the children physically and emotionally, especially if she refused to acknowledge their experiences.

Regarding whether there was a "reasonable likelihood that the conditions would be rectified within a reasonable time considering the child's age," the trial court observed that mother had not benefited from the most recent services offered, and had likewise not benefited from "11 years of service delivery." The court further noted that mother had received every service that the child-welfare system had to offer. Both children had waited for nearly two years for mother to provide them a stable environment and were facing an extended trauma-informed therapy. In light of these circumstances, the trial court found that the children had an immediate need for stability and finality that mother could not provide. In light of the foregoing, the trial court did not clearly err by finding statutory grounds for termination under MCL 712A.19b(3)(c)(*i*).[3]

## B. BEST INTERESTS

Mother next contends that the trial court erred by finding that a preponderance of the evidence established that termination was in the children's best interests. We agree in part.

This Court reviews a trial court's best-interests determination for clear error. *In re White*, 303 Mich App 701, 713; 846 NW2d 61 (2014). "A finding of fact is clearly erroneous if the reviewing court has a definite and firm conviction that a mistake has been committed, giving due regard to the trial court's special opportunity to observe the witnesses." *In re Miller*, 347 Mich App 420, 425; 15 NW3d 287 (2023) (citation omitted).

"The trial court must order the parent's rights terminated if the Department has established a statutory ground for termination by clear and convincing evidence and it finds from a preponderance of the evidence on the whole record that termination is in the child[]'s best interests." *In re White*, 303 Mich App at 713. When determining best interests,

> the court should consider a wide variety of factors that may include the child's bond to the parent, the parent's parenting ability, the child's need for permanency, stability, and finality, and the advantages of a foster home over the parent's home. The trial court may also consider a parent's history of domestic violence, the parent's compliance with his or her case service plan, the parent's visitation history with the child, the children's well-being while in care, and the possibility of adoption. [*Id*. at 713-714 (quotation marks and citations omitted).]

In making a best-interest determination, the focus is on the child, not the parent. *In re Schadler*, 315 Mich App 406, 411; 890 NW2d 676 (2016).

Mother broadly argues that the trial court did not adequately consider: (1) whether the children's behavioral issues were not in part due to delayed reunification; (2) that WH's threats of self-harm began while he was in foster care; (3) that MH reported being inappropriately touched by another child in her placement; (4) concerns regarding MH's vision that arose while she was in

---

[3] Because "one ground is sufficient to affirm the termination of the respondent's parental rights", *In re Sanborn*, 337 Mich App at 273, we decline to address mother's arguments regarding MCL 712A.19b(3)(g) and (i).

foster care; and (5) that the children would likely be adopted separately. Regarding delayed reunification, the court specifically noted the significant emotional struggles and trauma experienced by the children were due to the ongoing uncertainty and repeated changes in the direction of the case. The court also addressed WH's mental health while in foster care, noting that he was admitted for psychiatric treatment while in foster care and that mother was unable to prioritize his needs, requiring ex parte petitions for his admission and medication. The court did not specifically address MH's allegations of inappropriate touching or her medical issues, but did address the children's overall wellbeing while in care, largely focusing on their emotional wellbeing. Finally, regarding the potential that the children may end up in separate adoptive homes, the court observed that MH's caregiver was open to adopting her, as well as possibly adopting WH, if he could be stabilized.

Mother additionally contends that the trial court's best-interest analysis was flawed because the court did not make particularized findings for each child. See *In re Olive/Metts Minors*, 297 Mich App 35, 42; 823 NW2d 144 (2012). Generally, a court is not required to explicitly make individual and redundant factual findings concerning each child's best interests if the children's best interests do not significantly differ. *In re White*, 303 Mich App at 715-716. Even so, we believe that the record revealed significant differences between WH and MH, such that an individualized best-interests analysis was necessary in this case.

Broadly speaking, the court's best-interest analysis largely focused on WH. The court considered the bond between parent and child, finding that the bond between mother and WH was broken. The court also weighed WH's need for permanency, stability, and finality, noting this was "the third case for [WH] since he has been born being made a ward of the court," and considering his desire for the proceedings to end. The record suggests that among WH's greatest needs was emotional stability. The court found that "[WH] is angry at his mother for not believing his disclosures, and he directs that pain inward thinking he is an unworthy, unlovable child, and he directs it at anger at the system and classmates." The court further found that WH no longer wanted to see mother. It concluded that the advantages of the foster home were superior to remaining in mother's care. This conclusion was supported by the record. The BCS supervisor testified that WH's current placement had significant training and experience with high-needs children, and that WH had had fewer meltdowns since the suspension of mother's parenting time. Thus, the trial court properly considered numerous factors when making its best-interest determination regarding WH. It did not err by concluding that termination was in WH's best interests.

However, the court failed to meaningfully analyze MH's specific circumstances. Instead, the court's analysis largely treated MH as part of a unit, making general statements about "the children" without adequately distinguishing between their individual circumstances. Regarding MH's bond with mother, the court merely noted that "[MH] wants to see her mother, although this has become inconsistent." The record nevertheless suggested that MH's bond with mother remained strong. The court failed to address MH's specific need for permanency or how her continued desire to maintain contact with mother should factor into the best-interests determination. Ultimately, the court's failure to adequately individualize its best-interests analysis for MH constituted clear error. We therefore vacate the portion of the order terminating mother's parental rights as to MH. On remand, the trial court must conduct a new best-interests analysis that specifically addresses MH's individual circumstances.

## C. REASONABLE EFFORTS

Mother also argues that the trial court erred by determining that DHHS made reasonable efforts at reunification after new circumstances arose that differed from those that led to the original adjudication. We disagree.

This Court generally reviews for clear error a trial court's decision regarding reasonable reunification efforts. *In re Atchley*, 341 Mich App 332, 338; 990 NW2d 685 (2022). Generally, "the Department has an affirmative duty to make reasonable efforts to reunify a family before seeking termination of parental rights." *In re Hicks/Brown*, 500 Mich 79, 85; 893 NW2d 637 (2017), citing MCL 712A.18f(3)(b) and (c), and MCL 712A.19a(2). See also *In re Simonetta*, 340 Mich App 700, 707; 987 NW2d 919 (2022). The parents have a corresponding responsibility to engage with and benefit from the services offered. See *In re Frey*, 297 Mich App 242, 248; 824 NW2d 569 (2012). As part of these reasonable efforts, "the [Department] must create a case service plan outlining the steps that it and the parent will take to rectify the conditions that led to court involvement and achieve reunification." *In re Simonetta*, 340 Mich App at 707. The trial court should regularly update the plan to account for the parent's progress and developing needs. *In re Mason*, 486 Mich at 159. The parent should be given a reasonable time to make changes and benefit from services before termination of parental rights. See *id*. "When challenging services offered, a respondent must establish that he or she would have fared better if other services had been offered." *In re Sanborn*, 337 Mich App at 264.

The premise of mother's argument is that emotional stability, parenting skills, and child characteristics were new circumstances introduced into the case by the May 2024 break-in. She contends that DHHS should have provided new or additional services tailored to these circumstances. The record shows, however, that emotional stability and parenting skills were areas of need identified in mother's initial parent-agency treatment plan (PATP). The record further indicates that DHHS provided services to address these issues from the start and offered additional services after the May 2024 break-in.

Regarding emotional stability, the initial PATP reflected that mother was given a psychological evaluation, through which she was diagnosed with major depression. The PATP also noted that mother displayed explosive behavior in her communications with agency staff, which sometimes resulted in her refusing to leave the premises until her demands were met. Consequently, DHHS referred mother to counseling that focused on domestic relations and addressed issues affecting mother's emotional stability.

As to parenting skills, the initial PATP identified that mother was involved in a parent coach program and was taking a Parenting After Trauma class, both of which were provided by DHHS. DHHS later provided the services of a parenting-time specialist, who addressed how to manage the children's behaviors during supervised community parenting time. According to the record, mother engaged in trauma-informed parenting sessions with the children's enhanced-foster-care (EFC) specialists. After the May 2024 break-in, mother attended Together Facing Challenges, a program designed to teach caregivers how to "navigate children with trauma" and children who "have a lot of big behaviors." In addition to these services, the caseworker and mother read and discussed a book about parenting in the aftermath of family violence, which mother had expressed an interest in reading.

The children's challenging behaviors could not be deemed new developments attributable to the May 2024 break-in. At least nine months before the break-in, the July 2023 PATP reported that WH showed "severe behavioral problems." In summer 2023, WH was seen at Helen DeVos Children's Hospital because of threats of self-harm. By fall 2023, WH had been suspended from school three times for threatening to harm himself and others, as well as for other disruptive behavior. By winter 2024, WH was responding well to prescription medication; his mood and focus were better, and he had not been suspended since mid-November.

Mother asserts that DHHS did not facilitate her engagement in WH's counseling, which prevented her from understanding the extent of his needs and how to address them. This is belied by the record. Not only did DHHS provide services that addressed trauma in general, such as Parenting After Trauma and Together Facing Challenges, DHHS also provided a parenting-time supervisor to assist mother with the children's behaviors as parenting time transitioned to the community. In addition, as early as March 2023, mother agreed in her PATP "to engage in the children's services, as desired, such as therapy and/or EFC services for youth." Mother worked with the EFC specialists, including participating in trauma-informed parenting sessions.

As the foregoing shows, emotional stability and parenting skills were not new barriers to reunification that first arose in May 2024. DHHS provided mother with services to address these areas of need throughout the pendency of this matter. Mother offers no substantive argument on how the services provided were deficient. She lists the recommendations in her psychological evaluation to essentially argue that the services offered by the Department were insufficient. But when challenging the services offered, mother must establish that she would have fared better if other services had been offered. See *In re Sanborn*, 337 Mich at 266. Mother has not made this showing.

Mother also argues that DHHS's efforts were not reasonable because the children's initial counselors were not competent to deal with the children's issues. Mother does not explain how the outcome of the proceeding would have been different with an earlier change in therapists. She merely speculates that doing so would have allowed her to avoid the termination of her parental rights. Accordingly, mother has not established that the trial court erred by concluding that DHHS made reasonable efforts toward reunification.

## D. PROCEDURAL AND EVIDENTIARY ERRORS

Lastly, mother alleges that various procedural and evidentiary errors require reversal of the trial court's termination order. We disagree.

This Court reviews de novo whether child protective proceedings complied with a respondent's constitutional rights, *In re HRC*, 286 Mich App 444, 462; 781 NW2d 105 (2009), as well as the trial court's interpretation and application of statutes and court rules, *In re Sanders*, 495 Mich 394, 404; 852 NW2d 524 (2014). This Court reviews a trial court's evidentiary rulings in a termination proceeding for an abuse of discretion. A trial court abuses its discretion when its decision falls outside the range of principled outcomes. *In re Jones*, 286 Mich App 126, 130; 777 NW2d 728 (2009).

Mother first contends that the trial court erred by granting an oral motion made by counsel for DHHS, requesting leave to amend the supplemental petition to add MCL 712A.19b(3)(i) as a ground for termination. She argues that she was prejudiced by this last-minute addition. If not for the improper and untimely inclusion of MCL 712A.19b(3)(i) as a ground for termination, mother contends that her parental rights would not have been terminated. However, the record indicates that mother's attorney waived this issue by explicitly stating that he did not object to DHHS's motion. Additionally, as mentioned earlier, the trial court properly terminated mother's parental rights under MCL 712A.19b(3)(c)(*i*). As already indicated, only "one ground is sufficient to affirm the termination of the respondent's parental rights." *In re Sanborn*, 337 Mich App at 273. Mother therefore cannot show that she was prejudiced by DHHS's oral motion to amend the supplemental petition for termination of her parental rights.

Mother also asserts that DHHS filed its witness list and discovery demands late and that there was no proof of service indicating their transmission to mother or her attorney at the time. She asserts that these errors prejudiced her ability to prepare for the termination hearing.

This issue comes to us unpreserved. Therefore, our review is for plain error affecting substantial rights. *In re MJC*, ___ Mich App ___, ___; ___ NW3d ___ (2023) (Docket No. 365616); slip op at 2. "To avoid forfeiture under the plain error rule, three requirements must be met: (1) error must have occurred, (2) the error was plain, i.e., clear or obvious, (3) and the plain error affected substantial rights." *In re VanDalen*, 293 Mich App 120, 135; 809 NW2d 412 (2011) (quotation marks and citation omitted). An error is clear or obvious if the error is "not subject to reasonable dispute." *In re Pederson*, 331 Mich App 445, 463; 951 NW2d 704 (2020) (quotation marks and citation omitted). "Generally, an error affects substantial rights if it caused prejudice, i.e., it affected the outcome of the proceedings." *In re Utrera*, 281 Mich App 1, 9; 761 NW2d 253 (2008). The party asserting plain error bears the burden of persuasion with respect to prejudice. *In re Pederson*, 331 Mich App at 463.

Although DHHS erroneously sent its witness list and discovery demands to mother's former attorney, rather than to the attorney representing her at the termination hearing, mother has not established prejudice. Mother has not provided an offer of proof, such as an affidavit from the attorney who represented her at the termination hearing, affirming that he did not receive notice or disclosure documents, notwithstanding the incorrect service, or that he was unprepared to proceed at the termination hearing. Further, nothing in the record suggests that mother's attorney was unprepared to proceed. Accordingly, mother has not met her burden to establish that she was prejudiced by the circumstances surrounding DHHS's filing of its witness list and discovery demands. See *id*.

Mother next argues that the supplemental petition added three circumstances different from the original petition: child characteristics, emotional stability, and parenting skills. Mother contends that DHHS was required to prove these new circumstances by clear and convincing, legally admissible evidence. She argues, however, that the trial court erred by admitting impermissible hearsay evidence regarding a report made by WH's counselor, mother's parenting skills, and the children's statements about father living in mother's basement. In addition, mother asserts that testimony from the BCS supervisor about mother's alleged inability to manage the children's behaviors was not attributable to personal knowledge. Therefore, she asserts, it constituted an improper lay opinion. We find no error requiring reversal.

MCR 3.977 "applies to all proceedings in which termination of parental rights is sought." MCR 3.977(A)(1). If termination did not occur at the initial disposition hearing and the case later proceeds to termination on grounds that formed the basis for adjudication, then the rules of evidence—except those for privilege—typically do not apply at the termination hearing. See MCR 3.977(H); MCR 3.977(H)(2). Instead, "[a]t the hearing all relevant and material evidence, including oral and written reports, may be received by the court and may be relied upon to the extent of its probative value." MCR 3.977(H)(2). However, at a termination hearing on "a supplemental petition that seeks to terminate the parental rights of a respondent over a child already within the jurisdiction of the court on the basis of one or more circumstances new or different from the grounds that led the court to take jurisdiction," the trial court's findings must be based on "legally admissible evidence." MCR 3.977(F)(1)(b).

Although the trial court mentioned the children's characteristics during its oral ruling, the court terminated mother's parental rights on the basis of her inability to manage the children because of her own emotional instability and parenting skills. Those same grounds led the trial court to exercise jurisdiction at the beginning of the proceedings. As already indicated, mother admitted that emotional instability was a factor in a prior termination. She also admitted that, since 2021, police had responded to numerous instances of domestic violence, many of which involved emotional-health issues. As to allegations that fall under parenting skills, mother admitted CPS involvement with the family in 2016, when WH was found crying after food left cooking on the stove set off fire alarms, which mother and father did not hear because they were passed out. She also admitted to CPS involvement in 2019 on the basis of improper supervision of both children. Even if the specific challenges to mother's emotional stability and parenting skills evolved during the case, mother's emotional instability and poor parenting skills were among the reasons for the trial court's initial exercise of jurisdiction. Accordingly, mother's parental rights were not terminated on the basis of new circumstances, and MCR 3.977(F)(1)(b) did not apply.

Mother finally argues that the trial court erred by overruling her trial counsel's objection to the admission of reports that he recently received and had not had a chance to review. She asserts in her brief to this Court that the trial court's error "prejudiced her in the filing of the termination petition supplement." Assuming for the sake of argument that the trial court abused its discretion by admitting the reports before counsel had an opportunity to review them, mother cannot show that, but for this error, the trial court would not have authorized DHHS to file a supplemental petition seeking termination of her parental rights. See MCR 2.613(A); see also *In re Utrera*, 281 Mich App at 21. To the contrary, a caseworker's sworn testimony at a November 2024 permanency planning hearing provided a sufficient basis for the trial court to determine that the supplemental petition was warranted. Accordingly, mother has not shown a procedural or evidentiary error requiring reversal of the trial court's order terminating her parental rights.

Affirmed in part, vacated in part, and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction.

/s/ Michelle M. Rick
/s/ Allie Greenleaf Maldonado
/s/ Daniel S. Korobkin